IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

State of Ohio, et al.,                             Case No. 3:10 CV 2537

             Plaintiffs,              MEMORANDUM OPINION
                                      AND ORDER

     -vs-
                                      JUDGE JACK ZOUHARY

GMAC Mortgage, LLC, et al.,

             Defendants.

### INTRODUCTION

Before the Court is an Emergency Motion to Remand filed by Plaintiff, the State of Ohio, acting through the Ohio Attorney General ("OAG") (Doc. No. 6). Defendants Ally Financial, Inc. ("Ally"), GMAC Mortgage, LLC ("GMAC"), and Jeffrey Stephan ("Stephan") have opposed (Doc. Nos. 10, 12). This Court heard argument on the Motion on November 19, 2010. For the reasons set forth below, Plaintiff's Motion is denied.

### BACKGROUND

This case is one of the first of many filed by state attorneys general across the nation seeking relief from mortgage companies' use of "robosigners" to process mortgage foreclosure paperwork. Several national banks have been accused of using robosigners -- loosely defined as bank employees tasked with rapidly signing large numbers of affidavits and legal documents asserting the bank's right to foreclose without the employees actually checking the documents to ensure their accuracy -- to fraudulently foreclose on homeowners during the recent financial downturn. *See* David Streitfeld, *JPMorgan Suspending Foreclosures*, N.Y. TIMES, Sept. 29, 2010, at B1; Jia Lynn Yang, *Wells Fargo*

*Acknowledges Problems in Foreclosure Paperwork*, WASH. POST, Oct. 27, 2010.  Some robosigners, such as Defendant Stephan, are alleged to have signed up to 10,000 foreclosure documents a month (Doc. No. 1, Ex. D, at 8).

The OAG's original Complaint, filed in the Lucas County Court of Common Pleas, seeks various state-law remedies against Defendants Ally, GMAC, and Stephan for their alleged fraudulent and unfair actions in connection with hundreds of mortgage foreclosure actions in Ohio.  Specifically, the OAG is targeting GMAC's alleged practice of robosigning false affidavits and other false documents while proceeding on foreclosures on hundreds of Ohio homes.  The OAG's claims are rooted in violations of the Ohio Consumer Sales Practices Act ("OCSPA"), O.R.C. § 1345.01 *et seq.*, and common law fraud (Doc. No. 1, Ex. D, at 14–16).

Despite the purely state-law basis for the OAG's claims, Defendants seek to invoke this Court's diversity jurisdiction under 28 U.S.C. § 1332(a).  Neither side seriously contests the diversity jurisdiction amount-in-controversy requirement (Hearing Transcript ("TR") at 16–17).   However, while all parties acknowledge that the named State of Ohio and OAG Plaintiffs are not citizens for purposes of invoking diversity jurisdiction, Defendants claim that it is individual citizens of Ohio that are the real-parties-in-interest -- not the State or the OAG.  Therefore, Defendants claim diversity exists because all the real-Plaintiffs-in-interest -- the threatened Ohio homeowners -- and all Defendants are citizens of other states.  The OAG counters that Ohio is the real-party-in-interest and that any relief sought for individual Ohio citizens is secondary to Ohio's primary interest in protecting Ohio mortgage consumers.  Therefore, the simple-to-ask, yet difficult-to-answer, question presented to this Court is:  Who *is* the real-party-in-interest in the State's attempt to stop Defendants' alleged robosigning practice?

2

## STANDARD OF REVIEW

Federal courts are courts of limited jurisdiction. It is presumed that a case lies outside of this limited jurisdiction and the burden rests on the party asserting jurisdiction. *Turner v. Bank of North America*, 4 U.S. (4 Dall.) 8, 11 (1799); *McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 182–83 (1936). Under 28 U.S.C. § 1441, any civil action brought in a state court, but which a federal district court would have original jurisdiction, may be removed by the defendant to the district court. District courts have original jurisdiction of civil actions where the amount in controversy exceeds $75,000 and is between citizens of different states. 28 U.S.C. § 1332(a). "The burden of showing that the district court has original jurisdiction is on the party seeking removal." *Long v. Bando Mfg. of Am., Inc.*, 201 F.3d 754, 757 (6th Cir. 2000). Removal statutes are strictly construed and "all doubts as to the propriety of removal are resolved in favor of remand." *Alexander v. Elec. Data Sys. Corp.*, 13 F.3d 940, 949 (6th Cir. 1994); *Coyne v. American Tobacco Co.*, 183 F.3d 488, 493 (6th Cir. 1999).

In determining diversity jurisdiction, states are not considered "citizens" under 28 U.S.C. § 1332(a). *Moor v. Alameda County*, 411 U.S. 693, 717 (1973) (citing *Postal Tel. Cable Co. v. Alabama*, 155 U.S. 482, 487 (1894)). When a state is named as a party, federal courts must determine the real-party-in-interest, rather than simply relying on the names of the parties, to determine if there is diversity jurisdiction. *People of State of California ex rel. McColgan v. Bruce*, 129 F.2d 421, 423 (9th Cir. 1942) (citing *Ex parte Nebraska*, 209 U.S. 436, 444–45 (1908)).

## DISCUSSION

### Determining the Real-Party-in-Interest

The United States Supreme Court requires that the real-party-in-interest for diversity purposes be determined by looking at the "essential nature and effect of the proceeding." *Ford Motor Co. v.*

3

*Dep't of Treasury*, 323 U.S. 459, 464 (1945). In practical use, lower federal courts have pieced together a multi-factor analysis that attempts to deduce whether a state or some identifiable group of individuals is the real- party-in-interest. Some of these factors are whether: (1) state law requires that the action be brought in the name of the state; (2) the action will be a benefit or a detriment to the state treasury; (3) the state department bringing the suit is performing a governmental or proprietary function; (4) the state department is separately incorporated; (5) the state department has autonomy, and to what extent, over its operations; (6) the state department has the power to sue and be sued and to enter into contracts; (7) the state department is immune from state taxation; (8) the state has immunized itself from responsibility for the department's operations; and (9) the relief sought will inure to the state alone, or the judgment will effectively operate in favor of the state. *State ex rel. Guste v. Fedders Corp.*, 524 F. Supp. 552, 557 (D.C. La. 1981) (citing *DeLong Corp. v. Oregon State Highway Comm'n*, 233 F. Supp. 7 (D. Or. 1964); *Krisel v. Duran*, 258 F. Supp. 845 (S.D.N.Y. 1966)).

### Review Complaint as a Whole

Unfortunately, there is "great conflict" as to which of these factors should receive the most emphasis. *State ex rel. Guste*, 524 F. Supp. at 557. As a result, federal courts have generally split between two different approaches to determine the "essential nature and effect of the proceeding."

On one hand, a majority of jurisdictions, including several district courts in the Sixth Circuit, and courts in the First, Second, Fourth, Seventh, Eighth, and Eleventh Circuits, have looked at a state's complaint as a whole to determine whether the state is the real-party-in-interest.[1] "[W]hen

---

[1] *See e.g.*, *State of Maine v. First Jersey Securities, Inc.*, 655 F. Supp. 1370, 1370 (D. Maine 1987); *New York v. General Motors Corp.*, 547 F. Supp. 703, 704–05 (S.D.N.Y. 1982); *State of West Virginia v. Morgan Stanley & Co. Inc.*, 747 F. Supp. 332, 339 (S.D. W. Va. 1990); *Commonwealth ex rel. Stumbo v. Marathon Petroleum Co., LLC*, 2007 U.S. Dist. LEXIS 74117 (E.D. Ky. 2007); *Illinois ex rel. Scott v. Hunt Int'l Res. Corp.*, 481 F. Supp. 71, 73–74 (N.D. Ill. 1979); *State of Missouri ex. rel. Webster v. Freedom Fin. Corp.*, 727 F. Supp. 1313, 1317 (W.D. Mo. 1989); *State of Alabama ex rel. Galanos v. Star Serv. & Petroleum Co.*, 616 F. Supp. 429, 431 (S.D. Ala. 1985).

4

determining whether diversity jurisdiction exists when a state official brings an action, courts consider the complaint as a whole to determine whether the state is the primary beneficiary of the action." *Ohio ex rel. Dann v. Citibank (South Dakota), N.A.*, 2008 WL 1990363, at *3 (S.D. Ohio 2008); *see also Wisconsin v. Abbott Labs.*, 341 F. Supp. 2d 1057, 1062 (W.D. Wis. 2004) ("[M]ost courts analyze real-party-in-interest questions by examining the state's interest in a lawsuit as a whole."). Under this standard, the court uses a mix of the nine factors that make sense, given the facts of the case, and then attempts to determine, on balance, whether the state is the primary beneficiary in the outcome of the case. *See Commonwealth ex rel. Stumbo v. Marathon Petroleum Co., LLC*, 2007 U.S. Dist. LEXIS 74117, at *14 (E.D. Ky. 2007).

As an example, the court in *Marathon Petroleum* determined that the state was the real-party-in-interest in an action brought under the Kentucky Consumer Protection Act ("KCPA"). The state brought suit against two corporate gas station operators, Marathon and Speedway, that were accused of price gouging Kentucky's gasoline consumers in the wake of Hurricane Katrina. The court looked at the statute and complaint and weighed whether the statute granted the attorney general specific statutory authority to bring the suit in the name of the state, whether the relief sought was injunctive so as to regulate business conduct, whether any civil penalties would go to the state treasury, and whether any identifiable individual consumers would be granted redress. 2007 U.S. Dist. LEXIS 74117, at *11–14. The court then considered the four forms of relief requested by the state: a declaration that the defendants violated the KCPA and Anti-Price Gouging Act; an injunction preventing violations of the Anti-Price Gouging Act; civil penalties; and disgorgement and restitution of amounts received by defendants in violation of the KCPA. Finding the declaration, injunction, and civil penalties would primarily benefit all Kentucky consumers, while stating the restitution on behalf

5

of particular customers was only one aspect of otherwise wide-ranging relief, the court held that the state was a real-party-in-interest when viewing the complaint as a whole. *Id.* at *14.

### Review Claims Independently

On the other hand, a minority of jurisdictions, including courts in the Second and Fifth Circuit, have looked at each remedy sought by the state to determine the real-party-in-interest as to that specific relief. *See e.g.*, *State of Louisiana ex rel. Caldwell v. Allstate Ins. Co.*, 536 F.3d 418 (5th Cir. 2008); *Louisiana ex rel. Guste v. Fedders Corp.*, 524 F. Supp. 552, 554–57 (M.D. La. 1981); *Connecticut v. Levi Strauss & Co.*, 471 F. Supp. 363, 370–71 (D. Conn. 1979); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Cavicchia*, 311 F. Supp. 149, 155–58 (S.D.N.Y. 1970). The historical basis for this view appears to derive primarily from a turn of the century Supreme Court case that stated a plaintiff is the real-party-in-interest for diversity purposes "when the relief sought is that which enures to it alone, and in its favor the judgment or decree, if for the plaintiff, will effectively operate." *Missouri, Kan. & Tex. Ry. Co. v. Missouri R.R. & Warehouse Comm'r*, 183 U.S. 53, 59 (1901). As refined by modern courts, this approach, in effect, asks the court to split the claims for relief initially into two groups: claims made for private entities or for the state. The court then determines who is the real-party-in-interest with respect to each group of claims, and then may choose to retain jurisdiction or remand the case to state court, depending on which group predominates. Alternatively, the court can sever those claims in which the state is the real party in interest, thus destroying diversity jurisdiction and remanding those claims to state court, while retaining jurisdiction on the claims in which the state is not the real-party-in-interest.

One example of this approach was the Fifth Circuit's decision in *State of Louisiana ex rel. Caldwell v. Allstate Ins. Co.* The case involved an action by the Louisiana attorney general seeking

6

injunctive relief and treble damages on behalf of consumers harmed by the defendant insurance companies' alleged anti-competitive actions under a Louisiana state statute. Addressing the treble damage claims first, the court held that only those consumers who had been affected by the defendants' wrongful actions would benefit and thus it was the consumers that were the real-parties-in-interest. The court then separately analyzed the claims for injunctive relief, finding that if the attorney general had only pursued the injunctive remedy, the state's argument that it was the real-party-in-interest would have been much more compelling and would likely require remand. However, because it was combined with the damage claims, the court suggested the district court could serve as an "able manager" of the litigation and if necessary sever the state's injunctive relief claims and remand them to state court while keeping the damage claims. *Id.* at 429–30. Despite the observation that "during oral argument, counsel for Louisiana insistently maintained that severance was an option the State was not interested in pursuing," the court refused to remand the case. Instead the court continued, "However, if perchance Louisiana has reconsidered and the district judge finds it appropriate, we leave open this possibility." *Id.* at 430, n.11.

### State of Ohio's Complaint

A close reading of the OAG's Complaint presents difficult questions under either the complaint-as-a-whole or independent-claim-review approach. This Court's analysis begins by looking at the Complaint's prayer for relief which includes seven pertinent requests:[2]

---

[2] Several other forms of relief are requested but not considered here as they do not shed any light on the real-party-in-interest question. These include requests for an order to hold Defendants jointly and severally liable and for attorney fees and costs.

7

1. Preliminary and permanent injunction enjoining Defendants from continuing any foreclosure actions, summary judgment motions, default judgment motions, foreclosure sales, or submitting any robosigned affidavits in a foreclosure case;

2. Permanent injunction requiring Defendants to institute and follow a set of written procedures, to be approved by Plaintiff and the Court, that prevents any future use of robosigning in Ally or GMAC's foreclosure processes;

3. Appoint a referee, to be paid by Defendants, and require Defendants to submit quarterly reports for two years to demonstrate their compliance with this Court's orders;

4. Declare that each instance of robosigning constituted a violation of the OCSPA under O.R.C. §§ 1345.02 & 1345.031;

5. Order Defendants to pay actual and non-economic damages to all consumers injured by Defendants;

6. Assess a civil penalty of $25,000 for each separate violation of the OCSPA; and

7. Award Plaintiff punitive damages (Doc. No. 1, Ex. D, pp. 16–19).

On its face and viewed as a whole, the Complaint appears to be requesting relief -- injunctive, declaratory, and statutory penalties -- that would benefit Ohio consumers in general. The request for Defendants to pay damages to affected consumers might be viewed as secondary. However, just like the Court cannot simply rely on the names of the parties to determine the real-party-in-interest, the Court also cannot simply rely on the labels applied to the relief sought to definitively say the Complaint as a whole is seeking to advance the State's interest. Instead, by looking behind the labels of injunctive and declaratory relief, it appears that the real beneficiaries of the relief sought are a

distinct and identifiable group of Ohio citizens -- Ohio citizens with mortgages held by GMAC and Ally, that are in, or in danger of, foreclosure.

**Complaint as a Whole Analysis**

Generally, the State argues there are three reasons that it should be considered the real-party-in-interest: (1) the suit is attempting to protect Ohio residents "with respect to future conduct of Defendants regardless of the consumers involved"; (2) the State is entitled to act under its statutory and *parens patriae* authority to protect the public and Ohio's court system; and (3) the State has a direct financial interest in the outcome of the case because it is seeking statutory penalties that will go toward the Lucas County Treasury and the Ohio Consumer Protection Enforcement Fund (Doc. No. 11, at 5). The State further argues that its request for restitution, pursuant to its statutory mandate, does not turn the State a nominal party (Doc. No. 11, at 6).

There is no question that the OCSPA grants the OAG the right to pursue an action on behalf of the interests of all Ohio residents, including the requested declaratory, injunctive, and civil penalty relief. O.R.C. § 1345.07(A)–(D). It is also plausible that Ohio has expressed a quasi-sovereign interest sufficient to form the basis for a *parens patriae* claim out of the concern that Defendants committed a fraud upon the Ohio courts in the cases where false affidavits were allegedly submitted in support of foreclosure actions. *See Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982). These principles -- acting under its explicit statutory authority and protecting the public welfare -- provide fertile ground for the OAG to plant the seeds of its arguments. However, like seeds that fail to take root and develop beautiful blooms, the OAG's arguments similarly fail to show how this case would benefit Ohio consumers in general.

9

Quite the contrary, the relief sought will not benefit citizens "regardless of the consumers involved." Instead, the requests for declaratory and injunctive relief would benefit only a specific subset of Ohio citizens -- Ohio consumers that (a) have chosen to obtain a mortgage from a specific lender (GMAC), (b) some smaller subset of those consumers that have the unfortunate experience of having their mortgage foreclosed upon, and (c) a yet again smaller subset of consumers in which a robosigner files a false affidavit or document in the foreclosure action (Doc. No. 11, Ex. D, at 16–18).

Viewed another way, the OAG's requested relief under the OCSPA seeks to benefit some defined set of individuals in a post-mortgage transaction scenario and would do little to protect Ohio citizens generally in pre-mortgage transaction decisions -- not the purpose of the OCSPA which was enacted to regulate "the practices used in making or seeking to make sales to consumers, and not the terms of completed sales with consumers." *Brown v. Market Development, Inc.*, 41 Ohio Misc. 57, 60 (Ohio Com. Pl. 1974). This weakens the OAG's claim that it is the public generally, and not a specific subset of GMAC customers, that is the real-party-in-interest.

The analysis of a sister district court in *Ohio ex rel. Dann v. Citibank (South Dakota), N.A.*, adds further clarification to this pre-transaction/post-transaction distinction. 2008 WL 1990363 (S.D. Ohio 2008). In *Citibank*, the OAG brought suit against credit card issuer Citibank under the same OCSPA statute at issue here. The complaint alleged Citibank was misleading college students by offering a literal "free lunch" without disclosing that students would need to fill out a credit card application in order to receive the free sandwich. In other words, Citibank was using deceptive methods to obtain customers, but was not misleading existing Citibank card holders. *Id.* at *1.

In assessing whether diversity jurisdiction was proper, the district court cited the principle from *Brown* above and explained that the OAG was seeking prospective injunctive and declaratory

10

relief, along with civil penalties, in attempting to secure Ohio as an honest marketplace. The OAG was not seeking relief for any individual students. Accordingly, the court held that Ohio, and not the potentially affected students, was the real-party-in-interest. *Id.* at *3–4. This makes sense because the purpose of the lawsuit tracks the purpose of the OCSPA -- seeking to limit questionable practices in "selling" their product to consumers -- and the relief sought would prevent a questionable business practice that may affect some larger segment of potential Ohio consumers.

Here, the beneficiaries of the relief sought are exactly the opposite. The OAG's requested relief is explicitly directed to a specific group that has a unique "completed [mortgage] sale" relationship with Ally and GMAC. Moving beyond the initial, presumptively broad label of injunctive relief in the OAG's Complaint, this narrow focus emerges. The OAG asks for injunctive relief preventing Defendants from continuing any foreclosure actions, summary judgment motions, default judgment motions, foreclosure sales, or submitting any robosigned affidavits in foreclosure cases that have "an affidavit or assignment signed by Stephan" (Doc. No. 1, Ex. D, at 16–17). This equitable relief would be welcome news for any GMAC mortgagor about to lose his or her home to foreclosure but of little interest to most other Ohio residents. Factoring in the rest of the requested relief, the news gets even better for the families in danger of losing their home because if the OAG is successful, they might even receive some money back in the form of damages.

On the other hand, the rest of Ohio's citizens may indirectly gain by the State's collection of civil penalties, possibly some punitive damages, and could take comfort in the fact that the OAG stopped one bank's alleged questionable practice. However, following our sister district courts in *Citibank* and *Marathon Petroleum*, this Court believes that when viewing the Complaint as a whole,

11

the real beneficiaries of the Complaint's narrowly tailored prayer for relief are those Ohio citizens under threat of foreclosure by GMAC and not the State of Ohio generally.

The OAG's *parens patriae* argument fares no better.  In order for the state to be more than a nominal party under the *parens patriae* doctrine, the state must articulate an interest apart from the interests of particular private parties -- i.e., the state must express a quasi-sovereign interest.  Though commonly determined on a case-by-case basis, quasi-sovereign interests sufficient to support a state's *parens patriae* argument generally fall into one of two categories: (1) an interest in the health and well-being -- both physical and economic -- of its residents in general; or (2) an interest in not being discriminatorily denied its rightful status within the federal system.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 607 (1982).

With no federalism issues at hand, the OAG's only argument rests on fitting into the first category.  While facially the OAG's argument that the State is attempting to protect the integrity of its courts is plausible, this is not enough to constitute a *parens patriae* action for two reasons.  First, while there is no definitive threshold on the proportion of the population of the state that must be adversely affected by the challenged behavior, there must be an injury to more than an identifiable group of individual residents.  *Id.*  Here, the alleged injury was inflicted only on an identifiable group of residents -- Ohio homeowners with a mortgage from GMAC that is in danger of, or already in, foreclosure.  Second, while indirect effects of the injury must be considered, the indirect injury must affect a sufficiently substantial segment of the state's population.  As a rule of thumb, this prong is met if the state would likely attempt to address the injury through its sovereign lawmaking powers, if able.  *Id.*  Yet the legislature is unlikely to act in a case like this -- there are already laws prohibiting the filing of false legal documents generally and unless the legislature shows some inclination to pass

targeted legislation to address one particular company's questionable practice, there is little reason for the state legislature to act.

The fact that the State chose to act on behalf of a group of residents under the OCSPA does not, by itself, automatically turn the action into an action that benefits all Ohio consumers. Instead, the OAG could be merely lending its power to assist an identifiable group that may otherwise be unable to bring suit and to preserve judicial resources by avoiding numerous similar private party actions. While this may or may not be the reason the OAG chose to pursue this case, there is scant support in the OAG's argument as to why or how Ohio would otherwise act under its sovereign powers to address the alleged injury. Accordingly, viewing the Complaint as a whole, this Court believes that it is the individual Ohio homeowners, and not the State of Ohio, that is the real-party-in-interest.

**Individual Claim Analysis**

The result would be the same under a real-party-in-interest analysis that reviews each claim for relief independently. Starting with the first two requests for relief, as noted above, the relief is directed only towards enjoining Defendants' alleged robosigning activities as it pertains to foreclosure activities against GMAC customers that involved Stephan and/or falsely signed documents. It fails to claim the robosigning practice is harming Ohio consumers generally or even Ohio homeowners whose home is subject to a mortgage independent of the mortgage holder. In other words, the injunctive and declaratory relief only will help GMAC's Ohio customers that are in foreclosure.

Looking at the Complaint from the opposite direction, it is relatively easy to envision other ways the Complaint might have been constructed to ensure mortgage companies were dealing fairly with Ohio residents facing foreclosure. If the Complaint were directed at multiple mortgage

13

companies that operate in Ohio, all of which were engaging in questionable or fraudulent mortgage foreclosure procedures, it might be more persuasive that the OAG was acting on behalf of Ohio mortgage consumers generally. Indeed, from the news articles cited above, this may be a more widespread problem among national banks in which the OAG may have an interest. However, that is not the case here. The State has chosen to pursue only a single mortgage company. Even though on its face the Complaint appears to name two mortgage companies, GMAC and Ally, the companies are directly related and constitute one actual Defendant -- Ally Financial, a Delaware corporation, is the parent of GMAC Mortgage, a Delaware limited liability company.

The other requested forms of relief, viewed individually, also are limited in scope to obtaining relief primarily for only those Ohio homeowners whose mortgages are held by GMAC. The third request for a referee would provide oversight only for the injunctive and declaratory relief mentioned above, thus again primarily benefitting a small subset of Ohio consumers. The referee would not be tasked with overseeing all GMAC mortgages, foreclosed or not, nor Ohio mortgages generally. Similarly, the request for "actual and non-economic damages to all consumers injured by the conduct of the Defendants" is a direct benefit to the same small group of Ohio homeowners that have been harmed by GMAC and Stephan's alleged fraudulent acts.

While it is true that Ohio would be the primary beneficiary of the requested civil penalties and punitive damages, this Court does not believe these forms of relief warrant the hassle of severing and remanding them back to state court as proposed in *Caldwell v. Allstate Ins. Co.* The assessment of statutory penalties under the OCSPA is clearly defined and if a jury should find that Defendants violated the statute, this Court can assess the statutory fines just as easily as the Ohio state courts. Similarly, this Court can oversee a jury's assessment of any potential punitive damage award. In light

14

of the weight of the other individual remedies sought, the presence of these two State-focused remedies do not require a finding that Ohio is the real-party-in-interest.

## CONCLUSION

While this Court acknowledges that Ohio has a general interest in protecting its citizens against fraudulent mortgage foreclosure practices such as robosigning, that is not what is happening here. Instead, the OAG has sought out one particular mortgage company to seek relief that will not, at a first order level, benefit all Ohio residents. The relief sought will primarily benefit those specific Ohio homeowners with GMAC mortgages that are in foreclosure. While there are undoubtedly some secondary benefits to the Ohio economy in general -- potentially fewer or more orderly GMAC foreclosures, less damage to property values, a deterrent against filing fraudulent court documents, and perhaps speculative benefits that other Ohio mortgage companies will be more careful in their foreclosure practices -- these are not the primary, identifiable forms of relief that will be obtained from the Complaint.

Accordingly, this Court finds that the real-parties-in-interest are the specific Ohio homeowners whose mortgages are held by GMAC and thus diversity of citizenship exists, giving this Court jurisdiction over the action. The Emergency Motion to Remand is denied.

IT IS SO ORDERED.

    s/ *Jack Zouhary*
JACK ZOUHARY
U. S. DISTRICT JUDGE

January 14, 2010